1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7

8              FOR THE NORTHERN DISTRICT OF CALIFORNIA

9    MICHAEL SCOTT JONES,

10              Petitioner,                          No. C 04-2105 JSW

11        v.

12   JOSE SOLIS, Warden,                      **DENIAL OF PETITION FOR**
                                              **WRIT OF HABEAS CORPUS**
13              Respondent.
     _____/

14

15        Michael Scott Jones ("Petitioner"), a state prisoner incarcerated at the Correctional

16   Training Facility in Soledad, California, filed this petition on May 3, 2004, for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  This matter is now before the Court for consideration of

18   the merits of the habeas petition.  For the reasons discussed below, the Court DENIES the

19   petition.

20                            **PROCEDURAL BACKGROUND**

21        In 1989, Petitioner was convicted in Ventura County Superior Court of murder in the

22   second degree and use of a firearm.  (Respondent's Exhibit ("Resp. Exh.") D at 1.)  He was

23   sentenced to fifteen years to life plus two consecutive years.  (*Id.*)  Petitioner received a three-

24   year denial at his initial parole suitability hearing on November 16, 1999.  (*Id.* at 37-40.)  On

25   November 19, 2002, Petitioner appeared before the Board of Prison Terms ("BPT") for his

26   second parole suitability hearing.  (Pet. Exh. A.)  The BPT found Petitioner unsuitable for

27   parole and issued a one-year denial, which Petitioner now challenges.  (*Id.* at 39-42.)  Petitioner

28   was again found unsuitable for parole at a hearing on February 2, 2004.  (Resp. Exh. H at 52-

     56.)

*United States District Court*
For the Northern District of California

Following the November 19, 2002 denial of parole, Petitioner filed an administrative appeal, which was denied on the merits. (Pet. Exh. B.) Petitioner then filed a state habeas petition in the Ventura County Superior Court, which was denied on September 23, 2003. (Resp. Exh. I.) That petition was based on the same claims asserted in the instant action. (*Id.* at 1.) The superior court upheld the parole decision, finding that the record demonstrated that "the Board's decision was amply supported by the evidence in the record." (*Id.* at 2.) The California Court of Appeal and the California Supreme Court summarily denied Petitioner's habeas petitions. *In re Jones*, B171157 (Dec. 2, 2003) (Resp. Exh. J); *In re Jones*, S121259 (Jan. 28, 2005) (Resp. Exh. J). Petitioner timely filed his petition for federal writ of habeas corpus on May 3, 2004. On October 25, 2004, this Court ordered Jose Solis ("Respondent") to show cause why the writ should not be granted. On January 27, 2005, Respondent filed an answer to the petition. Petitioner filed a traverse on April 5, 2005. Petitioner retained counsel and filed a supplemental traverse on October 3, 2005. Respondent filed a supplemental answer on July 8, 2005.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d). *Lockyer v. Andrade*, 538 U. S. 63, 70-73 (2003). It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d). *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of

2

the time of the relevant state-court decision." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412 (2000); *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005) ("clearly established" federal law determined as of the time of the state court's last reasoned decision); *Alvarado v. Hill*, 252 F.3d 1066, 1068-69 (9th Cir. 2001). "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. The Supreme Court has repeatedly explained that AEDPA – which embodies deep-seated principles of comity, finality, and federalism – establishes a highly deferential standard for reviewing state-court determinations. *Id.* at 436. Thus, the Court has emphasized that "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

Under § 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at different result. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405-06). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413.

A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412. The objectively unreasonable standard is not a clear error standard. *Lockyer*, 538 U. S. at 75-76; *Clark v. Murphy*, 331 F.3d 1062, 1067-69 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003). After *Lockyer*, "[t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise. While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of

United States District Court

For the Northern District of California

1   deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." *Clark*,

2   331 F.3d at 1068.

3           In determining whether the state court's decision is contrary to, or involved an

4   unreasonable application of, clearly established federal law, a federal court looks to the decision

5   of the highest state court to address the merits of a petitioner's claim in a reasoned decision.

6   *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000); *Packer v. Hill*, 291 F.3d 569,

7   578-79 (9th Cir. 2002), *rev'd on other grounds*, 537 U.S. 3 (2002).  The court also looks to any

8   lower court decision examined and/or adopted by the highest state court to address the merits.

9   *Williams v. Rhoades*, 354 F.3d 1101, 1106 (9th Cir. 2004) (because state appellate court

10  examined and adopted some of the trial court's reasoning, the trial court's ruling is also

11  relevant).  The standard of review under AEDPA is somewhat different where the state court

12  gives no reasoned explanation of its decision on a petitioner's federal claim and there is no

13  reasoned lower court decision on the claim.  In such a case, a review of the record is the only

14  means of deciding whether the state court's decision was objectively reasonable.  *Himes v.*

15  *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Greene v. Lambert*, 288 F.3d 1081, 1088 (9th

16  Cir. 2002).

17          A federal habeas court may also grant the writ if it concludes that the state court's

18  adjudication of the claim "resulted in a decision that was based on an unreasonable

19  determination of the facts in light of the evidence presented in the State court proceeding."  28

20  U.S.C. § 2254(d)(2); *Rice v. Collins,* 126 S. Ct. 969, 975 (2006).  A district court must presume

21  correct any determination of a factual issue made by a state court unless the petitioner rebuts the

22  presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  This

23  presumption is not altered by the fact that the finding was made by a state court of appeal, rather

24  than by a state trial court.  *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242

25  F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001).

26          Habeas relief is warranted only if the constitutional error at issue is structural error or

27  had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Penry*

28  *v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638

United States District Court
For the Northern District of California

1   (1993)).  Under this standard, if the federal court determines that the state court's harmless error

2   analysis was objectively unreasonable, and thus an unreasonable application of clearly

3   established federal law, the federal court then proceeds to the *Brecht* analysis.  *Id.* at 787.

4          The Ninth Circuit has applied § 2254(d) to review of parole suitability decisions.  *See,*

5   *e.g., Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam); *see also McQuillion v.*

6   *Duncan*, 306 F.3d 895, 901 (9th Cir. 2002) (assuming without deciding that AEDPA deferential

7   standard of review under § 2254 applies to such decisions).

8                                      **DISCUSSION**

9   **I.     Petitioner's Habeas Action Challenging the 2002 Denial of Parole Suitability Is**
    **Not Moot.**

10         Respondent argues that the instant petition should be denied as moot because Petitioner

11  has since received a subsequent parole eligibility hearing in 2004 that again found him

12  unsuitable for parole.  (Ans. at 8-9.)  The mootness doctrine, on which Respondent bases his

13  argument, stems from the requirement in Article III, § 2 of the Constitution that there exist a

14  case or controversy through all stages of federal judicial proceedings.  Throughout the

15  litigation, the plaintiff "must have suffered, or be threatened with, an actual injury traceable to

16  the defendant and likely to be redressed by a favorable judicial decision."  *Lewis v. Cont'l Bank*

17  *Corp.*, 494 U.S. 472, 477 (1990); *see also Cox v. McCarthy*, 829 F.2d 800, 803 (9th Cir. 1987)

18  (claim moot because petitioner cannot be released from term imposed for violating parole that

19  he has already served).  An exception to the mootness doctrine exists, however, where a claim is

20  "capable of repetition yet evading review."  *Hubbart v. Knapp*, 379 F.3d 773, 777 (9th Cir.

21  2004), *cert. denied*, 125 S. Ct. 913 (2005) (habeas petition challenging a civil commitment

22  under California's Sexually Violent Predators Act was found to "evade review" because its

23  duration was too short to be fully litigated prior to its expiration).  This exception applies when:

24  "'(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or

25  expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be

26  subject to the same action again.'"  *Id.* (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)).

27  Under the Ninth Circuit reasoning in *Hubbart*, "parole suitability hearings that are conducted

28  each year fall under both exceptions to mootness."  *Hudson v. Kane*, 2005 WL 2035590, *4

                                              5

1    (N.D. Cal. August 23, 2005). Therefore, the instant petition is not moot simply because

2    Petitioner has received subsequent parole suitability hearings. Because Petitioner's claims fall

3    within an exception to the mootness doctrine, the Court reaches the merits of the claims.

**II.    Existence of a Federally Protected Liberty Interest in Parole.**

5        Petitioner argues that the BPT violated his due process rights by failing to find him

6    suitable for parole, thus depriving him of a liberty interest. (Trav. at 6-15; Supp. Trav. at 5-8.)

7    Respondent argues that no such liberty interest exists. (Ans. at 11-15; Supp. Ans. at 2-6.) In

8    general, "[t]here is no constitutional or inherent right of a convicted person to be conditionally

9    released before the expiration of a valid sentence." *Greenholtz v. Inmates of Nebraska Penal &*

10   *Corr. Complex*, 442 U.S. 1, 7 (1979). However, "a state's statutory scheme, if is uses

11   mandatory language, 'creates a presumption that parole release will be granted' when or unless

12   certain designated findings are made, and thereby gives rise to a constitutional liberty interest."

13   *McQuillion*, 306 F.3d at 901 (citing *Bd. of Pardons v. Allen*, 482 U.S. 369, 377-78 (1987);

14   *Greenholtz*, 442 U.S. at 12).

15       The California statutory provision at issue provides, in pertinent part, that "[t]he panel

16   or the board, sitting en banc, *shall* set a release date *unless* it determines that the gravity of the

17   current convicted offense or offense . . . is such that consideration of the public safety requires a

18   more lengthy period of incarceration for this individual and that a parole date, therefore, cannot

19   be fixed . . . ." Cal. Penal Code § 3041(b) (emphasis added). This "shall-unless" language is

20   similar to the statutes that were at issue in *Allen* and *Greenholtz. See Allen*, 482 U.S. at 376

21   ("*Subject to the following restrictions*, the board *shall* release on parole . . . any person confined

22   in the Montana state prison or the women's correction center . . . when in its opinion there is

23   reasonable probability that the prisoner can be released without detriment to the prisoner or the

24   community.") (quoting Mont. Code Ann. § 46-230201 (1985)) (emphasis added and in

25   original); *Greenholtz*, 442 U.S. at 11 ("[w]henever the Board of Parole considers the release of

26   a committed offender who is eligible for release on parole, it *shall* order this release *unless* it is

27   of the opinion that his release should be deferred because . . . ." (quoting Neb. Rev. Stat. § 83-

28   1,114(1) (1976)) (emphasis added).

**United States District Court**
For the Northern District of California

6

Recognizing the similarity between California's statutory scheme and the statutory scheme at issue in *Allen* and *Greenholtz*, the Ninth Circuit has held that "California's parole scheme gives rise to a cognizable liberty interest in release on parole.  The scheme creates a presumption that parole release will be granted unless the statutorily defined determinations are made."  *McQuillion*, 306 F.3d at 902 (internal quotations and citations omitted).  The court reiterated the holding in *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003) ("[I]t is clear that 'California's parole scheme gives rise to a cognizable liberty interest in release on parole.'") (quoting *McQuillion*, 306 F.3d at 902).  Accordingly, under the holdings of *McQuillion* and *Biggs*, Petitioner has a federally protected liberty interest in parole.

**III.    The Requirements of Federal Due Process.**

Petitioner argues that the evidence before the BPT does not support its finding that Petitioner was unsuitable for parole.  (Pet. at 7.)  A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision.[1]  *McQuillion*, 306 F.3d at 904 (adopting "some evidence" standard for disciplinary hearings outlined in *Superintendent v. Hill*, 472 U.S. 445 (1985)); *see also Biggs*, 334 F.3d at 915.  The evidence underlying the board's decision also must have some indicia of reliability.  *McQuillon*, 306 F.3d at 904; *Biggs*, 334 F.3d at 915.  Most recently, in *Biggs,* the Ninth Circuit held that the some evidence standard may be considered in light of the board's decision-making process over time.  *See id.* at 917 (concluding that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation").

---

[1] Petitioner argues that the "some evidence" standard "deprives prisoners subject to discretionary parole of reasonable or equitable due consideration."  (Traverse at 4-6.)  Petitioner further contends in his supplemental traverse that Respondent should be required to satisfy an evidentiary burden higher than the "some evidence" standard.  (Supp. Traverse at 11-19.)  These arguments amount to nothing more than pleas to disregard the binding authority of *McQuillion*, which this Court cannot do.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

### A.      Standards for Granting Parole to Convicted Murderers in California.

In order to determine whether there was some evidence to support the BPT's decision that Petitioner was not suitable for parole, the Court must look to the relevant California regulations.

California Penal Code § 3041 (b) provides:

> The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

California Code of Regulations, title 15, § 2402, sets forth the criteria for determining whether an inmate is suitable for release on parole.  The opening paragraph of § 2402(a) states:

> Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

Under § 2402(c), the listed circumstances tending to show *unsuitability* for parole include:

> (1) Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:
>
> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>
> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>
> (C) The victim was abused, defiled or mutilated during or after the offense.
>
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.
>
> (2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
>
> (3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.
>
> (4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

> (5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.
>
> (6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

Cal. Code Regs. tit. 15, § 2042(c).

Under § 2042(d), the listed circumstances tending to show *suitability* for parole include:

> (1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
>
> (2) Stable Social History.  The prisoner has experienced reasonably stable relationships with other.
>
> (3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands that nature and magnitude of the offense.
>
> (4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.
>
> (5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome . . . and it appears the criminal behavior was the result of that victimization.
>
> (6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.
>
> (7) Age.  The prisoner's present age reduces the probability of recidivism.
>
> (8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.
>
> (9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

Cal. Code Regs. tit. 15, § 2402(d).

The panel may consider all relevant and reliable information available to it.  Cal. Code Regs. tit. 15, § 2402(b).

The regulations also contain a matrix of suggested base terms depending on the murder degree and the circumstances surrounding the murder.  The matrix provides three choices of suggested base terms for several categories of crimes.  *See id*. § 2403.  For second degree

9

United States District Court

For the Northern District of California

murders, the matrix of base terms ranges from the low of 15, 16, or 17 years, to a high of 19, 20, or 21 years, depending on some of the facts of the crime.[2]  Although the matrix is to be used to establish a base term, this occurs only after the prisoner has been found suitable for parole.  *See id.* § 2403(a).  The California Supreme Court has determined that the statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity.  *Dannenberg*, 34 Cal. 4th at 1070-71.

> While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum) sentences should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raises "*public safety*" concerns requiring further indefinite incarceration.  (Italics added.)  Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger*.

*Id.* at 1070 (emphasis, brackets, and parentheses as in original).[3]  In sum, "the Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life-maximum prisoner's crime individually."  *Id. at* 1071.

The California Supreme Court also has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable.  "While the board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release."  *Dannenberg*, 34 Cal. 4th at 1071; *see also In re Rosenkrantz*, 29 Cal. 4th 616, 682-83 (2002), *cert. denied*, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's

---

[2] One axis of the matrix concerns the relationship between murderer and victim and the other axis of the matrix concerns the circumstances of the murder.  The choices on the axis for the relationship of murderer and victim are "participating victim," "prior relationship," "no prior relationship," and "threat to public order or murder for hire."  The choices on the axis for the circumstances of the murder are "indirect," "direct or victim contribution," "severe trauma," or "torture."  Each of the choices are further defined in the matrix.  *See* 15 Cal. Code Regs. § 2403(c).

[3] The California Supreme Court's determination of state law is binding in a federal habeas action.  *Hicks v. Feiock*, 485 U.S. 624, 629 (1988); *Sandstrom v. Montana*, 442 U.S. 510, 516-17 (1979).

1   offense, alone, can constitute a sufficient basis for denying parole" but might violate due

2   process "where no circumstances of the offense reasonably could be considered more

3   aggravated or violent than the minimum necessary to sustain a conviction for that offense").

4           **B.      Analysis.**

5                   **1.      The Commitment Offense.**

6           The record before the Court does not contain a complete summary of the facts of

7   Petitioner's commitment offense.  Accordingly, the Court takes judicial notice of the statement

8   of facts by the California Court of Appeal in its opinion affirming the judgment of conviction,

9   *People v. Jones*, B047476 (March 21, 1991):

> Jones lived in a house with two roommates, Alex Morrissey and the victim, Thomas Day.  Morrissey was new to the house, but Jones and Day had been roommates for about two years.  Although Jones and Day were friends, they had fights on occasion.
>
> On the evening of May 29, 1989, Jones spent several hours with friends drinking in a bar.  One of the friends described him as being a little loud, but acting normal.  The group left the bar and went to the home of Bernie Hoffard who lived across the street from Jones and Day.  A friend drove Jones to Hoffard's house.  On the way Jones showed a revolver to the friend stating that he needed the gun for protection and asked that the gun not be mentioned to anyone.
>
> At Hoffard's house the group played cards and continued to drink beer.  Jones was coherent, his speech was not slurred and he had no problem with minor skills.  Although he seemed a little angry and intoxicated, he was not out of control.
>
> Hoffard's brother complained about the noise at about 3 a.m., and the party moved to Jones' house across the street.  The card playing and beer drinking continued there until Day came out of his room to complain about the noise. Jones told Day that he paid rent too and was entitled to invite people to his house.  Jones and Day locked arms.  Hoffard suggested that the party move back to his house, but recommended that Jones call it an evening and stay home. Jones complied, and the others left.  Morrissey, the third roommate, heard Day tell Jones, "'Thirty days and you are out of here.'"
>
> Morrissey and several neighbors heard the sound of gun shots.  Then Day knocked on Morrissey's door and asked him to call an ambulance.  By the time the ambulance arrived, Day had stopped breathing and could not be revived.
>
> Jones left the house, and took a bicycle from a neighbor's garage.  A police officer saw Jones riding the bicycle without any apparent balance problems. Jones jumped off the bicycle and began running when the officer approached. Another officer tackled Jones, and a gun skidded away from Jones' body.  After he was arrested, he told the police that he did society a favor.  Several days later he told a friend that he knew what he was doing and "the dick head deserved it."

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

An autopsy performed on Day disclosed that he had been shot five times, and that several shots had been fired into his back. A comforter removed from Day's bedroom contained several bullet holes caused by a gun fired somewhere between contact and four inches away. No alcohol or illegal narcotics were found to be present in Day's body.

Jones did not testify at his trial. However, evidence introduced in his defense disclosed the following:

Jones began to see Renee Grimes in December of 1988, but after a few months the relationship deteriorated. Nevertheless, Jones remained infatuated with Grimes and was upset because she did not want to be his girlfriend. Also, during the few weeks prior to the shooting, Jones had missed some work because of drinking, and was exceptionally irritable on the job. His boss told him to take a couple of weeks off. Adding to the emotional upset was Day's statement that Jones had 30 days to be out of the house.

A psychologist testified that Jones had a low estimate of his own worth and poor coping skills. Losing a girlfriend, a job and a place to live overwhelmed his ability to cope.

At 6:30 a.m. on May 20, Jones' blood alcohol was .26 percent. Thus, his blood alcohol at 4 a.m. was between .28 and .32 percent. An expert testified that alcohol substantially impairs judgment, perception and the ability to control impulses and emotions.

(Resp. Exh. C at 1-4.)

### 2.    Petitioner's Prior Parole-Related Proceedings.

Petitioner first appeared before the BPT for a parole suitability hearing on November 16, 1999. The BPT found Petitioner unsuitable for parole, finding the following:

Many factors were considered. First and foremost was the commitment offense itself. The offense was carried out in an especially cruel manner, a manner which demonstrates a callous disregard for human suffering. These conclusions are drawn from the Statement of Facts wherein the inmate, after partying with his friends and abusing alcohol during the time, was involved in an argument with his roommate culminating with the shooting of his roommate. The victim was shot five times with several shots in the back. Of course this resulted in killing a human being . . . . Regarding institutional behavior, sir, I acknowledge that you have accomplished one vocation, one vocation. And this Panel would like to see you obtain another vocation in addition to the one you currently have. Your parole plans, you lack realistic parole plans in that you do not have viable residential plans in the last county of legal residence. And you don't have acceptable employment plans. We feel that you need shore that up, sir. You need to get solid parole plans. Also, this Panel notes that the District Attorney from the County of Ventura is opposed to the parole suitability. And this Panel makes the following findings: The inmate needs therapy in order to discuss, to face, discuss, understand and cope with stress in a nondestructive manner. Until progress is made, the prisoner continues to be unpredictable and a threat to others.

(Resp. Exh. D at 37-39.)

**United States District Court**
For the Northern District of California

1      **3.      Petitioner's November 19, 2002 Parole Hearing.**

2          At the November 19, 2002 hearing, the BPT denied Petitioner parole, finding that:

3      [Petitioner] is not yet suitable for parole and would pose an unreasonable risk of
       danger to society or a threat to public safety if released from prison.  The offense
4      was carried out in an especially cruel manner.  The offense was carried out in a
       dispassionate manner.  The offense was carried out in a manner that demonstrates
5      an exceptionally callous disregard for human suffering.  These conclusions are
       drawn from the Statement of Facts, wherein the victim, Day, age 33, and the
6      inmate were friends and had lived together in the past.  The inmate went out
       partying and drinking at a bar and was brought home late in the evening drunk.
7      At home he eventually had a party in his residence that woke the victim.  An
       argument ensued and the victim was shot five times by the inmate.  The inmate
8      then escaped on a bicycle, and when he was arrested a few hours later, he was so
       intoxicated that he indicates now that he cannot remember the facts of the
9      commitment offense.  The prisoner has an unstable social history and prior
       criminality that includes alcohol use from age 11, two arrests for alcohol rated –
10     alcohol related offenses.  And he failed to graduate from high school, later
       receiving a GED.  Also the Panel notes that we received a response from the
11     Venture County District Attorney's Office.  Well on the 3042 notices, they
       indicated that they opposed parole and were going to send another letter.
12     However, they didn't send that other letter.  But they did indicate that they were
       opposed.  The Panel makes the following findings: The prisoner needs to continue
13     to participate in self-help in order to face, discuss, understand, and cope with
       stress in a non-destructive manner.  The prisoner should be commended for
14     remaining disciplinary free the entire time.  No – In 13, years, no 115's.
       Completing vocational silk screening and some business classes.  He has nine
15     laudatory chronos from NA and AA, one laudatory chrono from the Inmate Day
       Labor.  He should also be commended for participating in the ongoing
16     participation in the video reports, and participating in the Children's Holiday
       Festival 2001.  The Panel recommends that the prisoner remain disciplinary free
17     and continue to participate in self-help.  He should also cooperate with clinicians
       in the completion of a clinical evaluation.  This is a one-year denial, and we're
18     going to request a new psych report for the next hearing.

19     (Pet. Exh. A at 39-40.)

20          **4.      Whether Some Evidence Supports the BPT's Decision.**

21          The BPT denied parole in 2002 based on its conclusion that Petitioner presented an

22     unreasonable risk or danger to others based on the nature of the commitment offense, his

23     unstable social history, and his prior criminality.  The Court considers whether some evidence

24     supported the BPT's finding of unsuitability based on these factors.  The facts behind

25     Petitioner's commitment offense provide "some evidence" supporting the BPT's finding that this

26     offense was "carried out in a manner that demonstrates an exceptionally callous disregard for

27     human suffering."  (Pet. Exh. A at 39; Resp. Exh. C at 1-4.)  After a night of drinking, Petitioner

28     returned home with a group of friends and engaged in an argument with his roommate.  Angry

13

**United States District Court**
For the Northern District of California

and intoxicated, Petitioner shot his roommate five times, shooting him several times in the back at close range.  He then fled from the scene and ran from police.  After his arrest, he showed no remorse and in fact expressed pride in his actions to both police and a friend.  Therefore, the Court finds that the BPT's finding regarding the nature of the commitment offense was supported by some evidence.

The BPT also found that Petitioner had an unstable social history and prior criminality. (Pet. Exh. A at 40.)  This finding was based on Petitioner's history of alcohol abuse and his involvement in two other alcohol-related offenses.  (*Id.* at 9, 10-11, 13.)  At the hearing, Petitioner admitted that he considers himself an alcoholic and that he began drinking alcohol at age 15.  (*Id.* at 9, 13.)  In addition, Petitioner admitted his prior conviction for drunk driving in 1984 and his prior arrest for being intoxicated in a public place in 1986.  (*Id.* at 10.) Accordingly, the Court finds that the BPT's finding concerning Petitioner's social history and prior criminality was supported by some evidence.

Although the record reflects evidence that Petitioner has worked to improve himself while incarcerated, including remaining disciplinary-free, completing vocational silk screening and business classes, and participating in self-help, the record also reflects evidence supporting the BPT's denial, including consideration of the nature of the offense committed and Petitioner's history of alcohol abuse.  (*Id*. at 15-20, 40-41.)  Recognizing Petitioner's gains, the BPT stated: "You had a very serious drinking problem and the Panel wants to be confident that when you're released that you'll be able to hold on to these gains."  (*Id.* at 41.)  The BPT's decision to deny Petitioner parole based on the nature of the commitment offense and Petitioner's unstable social history and prior criminality is supported by some evidence.  Therefore, the Court concludes that the state court's decision denying Petitioner's habeas petition based on the BPT's parole suitability determination was not contrary to, or an unreasonable application of clearly established federal law, or a decision based on an unreasonable determination of the facts in light of the evidence presented.

United States District Court
For the Northern District of California

### 5.    Whether the BPT's Reliance on the Unchanging Facts of the Crime Violates Due Process.

In finding Petitioner unsuitable for parole, the BPT relied on unchanging factors: the commitment offense, Petitioner's unstable social history, and his prior criminality including alcohol use since youth.  The BPT also relied on these unchanging factors among others in finding Petitioner unsuitable for parole on November 16, 1999.  (*See* Resp. Exh. at 37.)  The Court now turns to the question whether the BPT's sole reliance in 2002 on the unchanging factors amounts to a violation of due process.

In *Biggs*, the Ninth Circuit indicated that a continued reliance on an unchanging factor such as the circumstances of the offense could, under certain circumstances, result in a due process violation.  334 F.3d at 917.  Biggs was serving a sentence of twenty-five years to life following a 1985 first degree murder conviction.  *Id.* at 912.  In the case before the Ninth Circuit, Biggs challenged the 1999 decision by the BPT finding him unsuitable for parole despite his record as a model prisoner.  *Id.* at 913.  While the Ninth Circuit rejected several of the reasons given by the BPT for finding Biggs unsuitable, it upheld three: (1) the commitment offense involved the murder of a witness, (2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another, and (3) Biggs could benefit from therapy.  *Id.* However, the Ninth Circuit cautioned the BPT regarding its continued reliance on the gravity of the offense and Biggs's conduct prior to the offense:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law.  Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest.

*Id.* at 916.

Thus, the Ninth Circuit concluded that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  *Id.* at 917.  The Ninth Circuit did not specify what number of hearings or years might constitute the requisite length of time to find that continuing reliance on an

**United States District Court**
For the Northern District of California

1  unchanging fact to deny parole amounts to a violation of due process, nor has it since.  Neither

2  have the district courts which have addressed challenges to the denial of parole based solely on

3  the commitment offense.  In cases similar to *Biggs*, however, where the denial of parole was

4  made at the petitioner's first parole suitability hearing, or at the first parole suitability hearing

5  where the BPT relied solely on the facts of the commitment offense to deny parole, no due

6  process violation has been found because there was some evidence to support the BPT's finding

7  and *Biggs* has not been addressed, *see, e.g., Rosas*, 428 F.3d at 1232 (denial of parole at first

8  parole suitability hearing); or no due process violation has been found because there was some

9  evidence to support the BPT's finding and the circumstances have been found not to rise to the

10 level of the concerns raised in *Biggs*, *see, e.g., Hudson*, 2005 WL 2035590 at *9-10 (denial of

11 parole at third parole suitability hearing, but first denial based solely on the facts of the

12 commitment offense).

13     In contrast, in those cases where the petitioner has had several parole suitability hearings

14 over a long period of time and the BPT panel relied solely on the commitment offense to deny

15 parole, a violation of due process and entitlement to relief under *Biggs* has been found.  *See, e.g.,*

16 *Irons v. Warden of Cal. State Prison - Solano*, 358 F. Supp. 2d 936, 947 (E.D. Cal. 2005)

17 (finding due process violation in denial of parole at fifth parole suitability hearing after petitioner

18 had served sixteen years of fifteen years to life sentence for second degree murder and met

19 circumstances tending to indicate suitability for parole), *appeal docketed*, No. 05-15275 (9th Cir.

20 Feb. 17, 2005); *Johnson v. Finn*, 2006 WL 195159, *12 (E.D. Cal. Jan. 19, 2006) (finding due

21 process violation in denial of parole at twelfth parole suitability hearing after petitioner had

22 served twenty-four years of sentence of life with the possibility of parole and met circumstances

23 tending to indicate suitability for parole); *Masoner v. State*, No. CV-03-1261-ER (C.D. Cal. Jan.

24 23, 2004) (finding due process violation based on BPT's "continued reliance" on pre-conviction

25 factors to justify denial of parole suitability after petitioner had served twenty-one years of

26 fifteen years to life sentence for second degree murder, had participated in therapy and self-help

27 programming and had impeccable prison record).

28

The Court finds that Petitioner's case here more closely resembles the facts of *Biggs* than it does those cases where a due process violation has been found.  At the time of his November 19, 2002 parole denial, Petitioner had served thirteen years of a fifteen years to life (plus two consecutive years) sentence and had only had one previous parole suitability hearing.  Also, the denial of parole suitability at the first hearing had been based on factors in addition to the nature of the commitment offense.  While the Court can envision that at some point the facts of Petitioner's case may more closely resemble those cases where relief has been granted, at this time the Court does not find that the BPT's reliance solely on the nature of the offense in denying Petitioner parole at his 2002 hearing violated his federal due process rights.  Accordingly, this claim for relief is denied.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied.  The clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated:  April 10, 2006

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California